W. TURNER, Admr., v. J. B. GAITHER.

*Infant—Necessaries—Ratification.*

1. A recovery cannot be had on a bond given by an infant to the administrator of his insolvent father for money of the estate loaned to enable such infant to acquire a professional education, on the ground that the consideration of such bond was "necessaries" for the minor.

2. An explicit acknowledgment by one after coming of age of a voidable indebtedness contracted in infancy is not a sufficient ratification to render the contract enforceable; there must be an express confirmation or new promise, voluntarily and deliberately made, with a knowledge that there is no existing legal liability.

(*Freeman* v. *Bridger*, 4 Jones, 1; *Hyman* v. *Cain*, 3 Jones, 111; *Jordan* v. *Coffield*, 70 N. C., 110; *Alexander* v. *Hutchison*, 2 Hawks, 535; *Dunlap* v. *Wales*, 2 Jones, 381, cited and approved.)

CIVIL ACTION tried at August Special Term, 1879, of IREDELL Superior Court, before *Gudger, J.*

The plaintiff declared upon certain notes under seal, and the defendant set up the plea of infancy and statute of limitations, in bar of recovery. The letter (dated in 1876) referred to in the opinion of this court and offered in evidence by the plaintiff to show that the defendant had ratified and confirmed the contracts made during his minority, is as follows:

*Messrs. W. Turner & Son:*

On a day not long since I received a letter from C. L. Turner saying he had papers in hand, in reply to which I will address father and son, and say I have no settlement to make with the son, but will deal exclusively with the father, or whoever settled the estate of A. B. F. Gaither, deceased. According to my memory, Mr. W. Turner has very small claims against me, as the principal of the note given him has been paid. The other papers are certificates merely showing that one J. B. Gaither received so much as

a part of his interest in A. B. F. Gaither's estate, to be accounted for on final settlement—witnessed and signed by Dr. Foote. Over three years ago I told Mr. W. Turner I was ready to settle whenever he showed me (the oldest heir) what went with the effects of said estate. I say so still, and claim a right to know. I do not say that Mr. Turner has acted dishonestly, but I want him to prove to me by showing accounts that he has acted honestly. I am not satisfied nor will I be until I see both sides of the books. If the estate was swept up by debts, show the facts and figures to me, then I will have no more to say. Some of Mr. Turner's younger children had a good deal to say about the estate and especially the heirs. It gored me and I began to suspect. The first thing that ever made me surprised was a remark made in my presence, namely, that Colonel Campbell's estate was wealthy, and when settled went as ours did. The James property at Olin was mentioned as belonging to estate, and worthless confederate money poked off on estate, and held and secured to administrator (that is the Olin property was). I have heard of good deal of dissatisfaction also from Ward's and other estates. Mr. McCubbins told me of meeting Mr. Turner and advised settling it up, but was shocked with surprise when told that W. Turner refused to show what went with the effects of the estate, and said as did my legal counsel that the heirs ought to have been represented when the final settlement was made, in fact the heirs should have been sued for settlement, and not cram off the thing in the manner in which it was done.

Please answer the following questions: Is not an administrator bound for the debts (that are due the estate) which he returns as good? If so, why was not William Gaither made to settle his debts as well as what mother bought at the sale, and was forced by threats and intimidations to sign a paper which she did not understand. Shame on you,

Mr. Turner. Close up every thing as near as you can, still there will be something unfinished. Ought not an administrator to know in two years how an estate will close? Did you not tell me two years after father's death that the children would get a thousand dollars and more apiece besides the land? Why was the estate not represented on the trial of the Grant suit? What went with all the gold you received? Was it returned as gold, was it sold as it should have been for one forty per cent that you charged me for the same gold I believe as late as the fall of '69? What went with proceeds of first sale, second sale, and sale of real estate? What rent did you collect from William Gaither, and did you make him refund the hundred dollars he took from his brother's desk? Please give a list of the debts you paid. I have heard of only a few small ones being paid. I must sooner or later see the records of A. B. F. Gaither's estate. Name the place and I will make my arrangements and meet you, W. Turner, with any one you may select to have a fair and square investigation, and do not say as before that it is none of my business what went with the estate. You had no right to a cent from any of us until you showed us where our estate had gone. The law says not, and let us abide by the law. Come square to the point, business is business, let us settle in a business-like manner. (Signed by the defendant.)

The other facts material to an understanding of the case are set out in the opinion of this court. Verdict and judgment for the plaintiff, appeal by the defendant.

*Mr. J. M. Clement*, for plaintiff.
*Mr. J. M. McCorkle*, for defendant.

SMITH, C. J. The action is brought on several notes under seal and accountable receipts, all of which, except the note bearing date October 30th, 1869, and a small sum not

disputed, were executed during the minority of the defend-
ant to the plaintiff, administrator of A. B. F. Gaither, his
father. The defences set up in opposition to the recovery
are infancy and the bar of the statute of limitations. Upon
an account ordered and reported during the progress of the
cause between the plaintiff and his intestate's estate, it ap-
peared that the assets had been administered and a large
indebtedness still remained unsatisfied. The moneys for
which the notes and receipts were given were used by the
defendant in defraying his expenses in procuring a medical
education in Philadelphia, and he had no other means than
those furnished by the plaintiff for that purpose. The
plaintiff insisted that the debt thus incurred was for neces-
saries, and relied on a letter addressed to him by the defend-
ant in June, 1876, eight years after he arrived at full age,
as evidence to repel the bar of the statute and as a ratifica-
tion of the contract.

Several issues were submitted to the jury, and their re-
sponses in substance are that the defendant was under
twenty-one years of age when the contracts were entered
into ; the moneys furnished were necessaries.; the statute of
limitations is not a bar, and the defendant has since attain-
ing majority ratified and confirmed the contracts.

During the trial the defendant's counsel asked the court
to charge the jury that "there is no evidence tending to
show that the money furnished the defendant was for
necessaries, the intestate's estate being insolvent, and that
money advanced or loaned was not in itself within the
meaning of the term *necessaries,* for which an infant can
incur a binding obligation.

The further instruction was also asked that the failure of
the plaintiff to make his final settlement of the intestate's
estate until 1874, eight years after the grant of administra-
tion, let in the statutory bar to the accountable receipts and
prevented a recovery on them. The court declined so to

charge and told the jury that the defendant's letter "amounted to a ratification of the notes and claims given by defendant to plaintiff and also repelled the statute of limitations."

There was judgment rendered on the verdict against the defendant and he appeals.

I. Were the moneys thus furnished and used in contemplation of law necessaries for the infant and is his contract to pay therefor valid against him? "Necessaries" are defined by Mr. Greenleaf to be "such things as are useful and suitable to the party's estate and condition in life and not merely such as are requisite for bare subsistence," and he cites as illustrations of the proposition that regimentals for an infant member of a volunteer military company, a livery for a minor captain's servant, a horse for an infant nearly of age, for exercise under a physician's advice, have been held to be included in necessaries, while money lent to supply them was not, unless actually used in their purchase. 2 Greenleaf Ev., § 365.

The doctrine with more strictness is thus laid down by PEARSON, J.: The general rule is that the contract of an infant is not binding on him. The exception is that an infant is bound to pay for goods sold and delivered to him, provided they are necessary for his support. This is put on the ground that unless an infant can get credit for necessaries he may starve, or, as it is expressed in some of.the cases, an infant must live as well as a man; therefore, the law. gives a *reasonable price* to those who furnish him with necessaries *ad victum et ad vestitum,* that is for victuals and clothes. LORD COKE says, (Co. Lit. 172 a) "it is agreed by all the books that an infant may bind himself to pay for his necessary meat, drink, apparel, physic and other necessaries." These last words embrace boarding, for shelter is as necessary as food and clothing. They have also been extended so as to embrace schooling and nursing (as well as physic)

while sick. In regard to the quality of the clothes and the kind of food, &c., a restriction is added that it must appear that the articles were suitable to the infant's degree and estate." It was accordingly held that timber for building a house of the value of $55 was not a necessary for which the defendant could be charged, although the house built was appropriate to his estate and station in society, and he had no other. *Freeman* v. *Bridger*, 4 Jones, 1.

The incapacity imposed upon an infant with the exception as thus explained, extends equally to expenses incurred in acquiring a professional education, and more certainly to money loaned for that purpose, which, however desirable for those whose means will admit, are not, in the sense of the law, necessaries for which the infant may enter into a valid obligation, and we are not at liberty to enlarge the operation of the exception. In this case the defendant had no estate whatever, and his expectation of deriving something from his father's estate, encouraged, as it would seem from the form of the receipts, by the plaintiff himself, has proved fruitless. *Hyman* v. *Cain*, 3 Jones, 111; *Jordan* v. *Coffield*, 70 N. C., 110.

II. Does the letter afford sufficient evidence of an intended ratification so as to bind the defendant to the fulfilment of the several contracts?

We are of opinion there is error in the ruling of the court upon this question also, and as to the effect of the evidence in sustaining the finding of the jury upon the second issue. "There is a distinction" says the learned author from whom we have before quoted, "between those acts and words which are necessary to ratify an *executory contract* and those which are sufficient to ratify an *executed contract*. In the latter case any act amounting to an explicit acknowledgment of liability will operate as a ratification; as in the case of a purchase of land or goods, if, after coming of age, he continues to hold the property and treat it as his own.

But in order to ratify an executory agreement, made during infancy, there must not only be an acknowledgment of liability, but an *express confirmation or new promise* voluntarily and deliberately made by the infant upon his coming of age, and with the knowledge that he is not legally liable. An explicit acknowledgment of indebtment, whether in terms or by a partial payment is not alone sufficient; for he may refuse to pay a debt which he admits to be due." 2 Greenleaf Evi. § 367.

To the same effect are the rulings in this state as a few references will show : " An examination of the authorities applicable to this question " (ratification), says TAYLOR, C. J., in *Alexander* v. *Hutchison*, 2 Hawks, 535, " leads irresistibly to the conclusion that the law is in favor of the defendant, and that the jury ought to have received an instruction that nothing short of an express promise to pay, made by the defendant after he had attained his age of discretion, would be sufficient to render him liable in this action." HENDERSON, J., in an opinion in the same case uses similar language: " This is unlike the promise which revives the remedy when barred by the statute of limitations, where the bare acknowledgment of an unsatisfied consideration is sufficient; for in this case there must be a new promise, an actual responsibility assumed after arriving at full age ;" and he adds, " anything either by words or acts which amounts to an assumption or promise of the debt is sufficient."

When the same case came again before the court (1 Dev. 13) the Chief Justice, correcting the misapprehension of the judge who tried it in the court below, who instructed the jury if they believed the witness to find a verdict for the plaintiff, thus explains his former opinion : " It should, I think, have been left to the jury to determine whether they would infer from the defendant's behavior a clear and unequivocal assent to and ratification of the contract. Any

act or conduct on his part, denoting a full assent of the mind and leaving nothing to doubt and conjecture without the utterance of any words, would be sufficient to warrant such an inference." HENDERSON, J., taking the same view, remarks: "When it is said that an implied promise will take a case out of the statute of limitations but that it requires an express promise, after full age, to bind a person to the performance of a contract, made during his minority, all that is thereby meant is that in the first case the law will make the promise if there is an acknowledgment of a sufficient consideration; in the latter case the *party must make it himself.*"

So in *Dunlap* v. *Wales,* 2 Jones, 381, an infant who had purchased and given bonds for two slaves, after reaching full age wrote proposing to return the slaves and pay half the debt, and added "if they will not accept the above offer I will have to pay them, I suppose, but I shall do so at my convenience, as it will be nothing less than a free gift on my part, the negroes being entirely worthless;" and it was decided that the defendant had not thereby rendered himself liable.

We have reproduced so largely from the opinions of the eminent judges who formerly presided in this court because they contain a clear and forcible presentation of the law on the subject. The letter produced falls short of these requirements, and still less authorizes an instruction that it is itself a ratification. Without detaching single paragraphs which are supposed to involve an assumption of liability, its tone is querulous throughout, complaining of mismanagement and waste of the assets as reasons why the defendant was unwilling to pay the debts. Upon no fair and reasonable construction of the letter as a whole does it admit a liability or assume the payment of the debt to be so declared to the jury. At most it was but evidence to be submitted to the jury and to be considered and weighed

with any other offered that might bear upon the question. While it may not have been necessary to pass upon the alleged confirmation, yet as the error was committed in answer to a refused prayer for an instruction and is thus presented for review in the appeal, and the decision of the point may contribute to an early final settlement of the controversy, we have deemed it proper to dispose of that matter also.

There is error and there must be a *venire de novo,* and it is so adjudged.

Error. *Venire de novo.*